**Thomas Kenneth ABRAHAM, an individual d/b/a Paddle Tramps Mfg. Co., Plaintiff,**

**v.**

**ALPHA CHI OMEGA, an unincorporated association, et al., Defendants.**

Case No. 3:08–cv–570–F.

United States District Court, N.D. Texas, Dallas Division.

April 26, 2011.

Elizann Carroll, Molly B. Richard, Richard Law Group Inc., Jeffrey S. Levinger, Hankinson Levinger LLP, Dallas, TX, for Plaintiff.

D. Ronald Reneker, Munsch Hardt Kopf & Harr PC, Dallas, TX, Amy S. Cahill, Jack A. Wheat, Jennifer L. Kovalcik, Stites & Harbison PLLC, Louisville, KY, Haley M. Dickerson, Stites & Harbison PLLC, Lexington, KY, for Defendants.

## ORDER GRANTING IN PART AND DENYING WITHOUT PREJUDICE IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ROYAL FURGESON, Senior District Judge.

BEFORE THE COURT is a Motion for Summary Judgment filed by the defendants and counter-plaintiffs in this action, an assortment of fraternity and sorority organizations ("the Greek Organizations") (Docket No. 54).[1] A Response was filed by Plaintiff Thomas Kenneth Abraham ("Kenneth Abraham") d/b/a Paddle Tramps Manufacturing Company ("Paddle Tramps") (Docket No. 65), and the Greek Organizations filed a subsequent Reply (Docket No. 72). The instant Motion concerns whether there is a genuine issue of material fact regarding whether Paddle Tramps committed trademark infringement, unfair competition, and trademark dilution under federal and Texas state law. Paddle Tramps has also filed a Motion for Summary Judgment regarding its affirmative defenses of laches and acquiescence (Docket No. 48), which has been fully briefed by the parties. The Court shall address Paddle Tramps's Motion in a separate order to be issued at a later date.

After considering the briefing of both parties, the Court is of the opinion that the Greek Organizations' Motion for Summary Judgment should be GRANTED IN PART AND DENIED WITHOUT PREJUDICE IN PART.[2]

## I. Factual Background

For the purposes of this Motion for Summary Judgment, the Court shall view the facts in the light most favorable to the non-moving party. *General Univ. Sys., Inc. v. Lee*, 379 F.3d 131, 137 (5th Cir. 2004); *Texas Tech Univ. v. Spiegelberg*, 461 F.Supp.2d 510, 528 (N.D.Tex.2006) (Cummings, J.). The Court shall discuss the facts relevant to the Greek Organiza-

---

1. The Greek Organizations include Alpha Chi Omega, Alpha Delta Pi, Alpha Gamma Delta, Alpha Gamma Rho, Alpha Omicron Pi, Alpha Phi, Alpha Tau Omega, Alpha Xi Delta, Beta Theta Pi, Chi Omega, Chi Phi, Delta Chi, Delta Delta Delta, Delta Gamma, Delta Phi Epsilon, Delta Tau Delta, Gamma Phi Beta, Kappa Alpha, Kappa Delta, Kappa Sigma, Lambda Chi Alpha, Phi Delta Theta, Phi Kappa Sigma, Phi Kappa Tau, Phi Kappa Theta, Pi Kappa Alpha, Pi Beta Phi, Sigma Alpha Epsilon, Sigma Chi, Sigma Kappa, Sigma Phi Epsilon, and Tau Kappa Epsilon, along with their corporate affiliates.

2. This resolves Docket No. 54.

tions' claims of trademark infringement, unfair competition, and trademark dilution, Facts only relevant to Paddle Tramps's Motion for Summary Judgment addressing its defenses shall be addressed in a separate order.

## A. The Greek Organizations

The 32 defendants and counter-plaintiffs in this case are all fraternity and sorority organizations with chapters on college campuses throughout the nation. Due to these organizations' penchant for using Greek letters in their names, they are known as "Greek organizations." All of the Greek Organizations were founded no later than 1959, and most of them are over 100 years old. The Greek Organizations act as holding-type companies which hold ownership of their properties, including their trademarks. Each Greek Organization is identified with a combination of Greek letters; examples of this include "Alpha Gamma Delta," "Sigma Alpha Epsilon," "Delta Delta Delta," and so forth. The Greek Organizations also use Greek letter insignia to identify themselves; in keeping with the examples just mentioned, those three Greek Organizations are also identified as "ΑΓΔ," "ΣΑΕ," and "ΔΔΔ." Most of the Greek Organizations are the owners of valid registrations of trademarks of these Greek letter combinations and insignia issued by the United States Patent and Trademark Office ("PTO").

Some registrations also consist of combinations of Greek letters other than the name of the Greek Organization that serve as a shorthand reference to that organization, such as "Pi Phi" for Pi Beta Phi. Some other Organizations possess trademark registrations of nicknames reflecting a Greek letter or multiple Greek letters contained in their names. Examples of

this type of trademark include "Teke" for Tau Kappa Epsilon, "SigEp" for Sigma Phi Epsilon, or "Pikes" for Pi Kappa Alpha. Additionally, many of the Greek Organizations have obtained valid registrations of a number of graphic designs, which vary in their complexity.[3] The images range from ornate and complex crests to simpler shapes such as a sheaf of wheat or a version of a cross. Many of these designs, particularly the crests, contain the Greek letter combinations or insignia of the Greek Organization possessing the trademark. The registrations of all of these marks range from as early as 1928 to as late as 2007. A small number of the marks at issue in this case are not registered with the PTO.

Members of the Greek Organizations, particularly new members (sometimes known as "pledges"), often decorate ceremonial paddles as part of their initiation into the fraternity or sorority. While paddles are often associated with the hazing practices of Greek Organizations, pledges often purchase a crafted wooden paddle, which they decorate to commemorate their membership in the individual Greek Organization or to convey to their "big brother" or "big sister" within the fraternity or sorority. Pledges frequently will purchase a blank paddle to decorate, and will also purchase several individual Greek letters, combinations of Greek letters, carvings of their fraternity or sorority's crest or symbol, and other wooden figures with which to decorate their paddle. This tradition of decorating paddles dates back decades, and is practiced by all of the Greek Organizations who are parties to this case. The Greek Organizations' marks are also used on other types of merchandise, including pins, clothing, glasses, and mugs, among other items.

---

**3.** The full range of the registered graphic designs can be found from pages 4 to 54 of the Greek Organizations' Answer and Counter-

claims (Docket No. 4). The symbols and crests are described in much greater detail later in this Order.

### B. Paddle Tramps's Foundation and Business

Kenneth Abraham pledged the Phi Gamma Delta fraternity while attending Texas Tech University in the fall of 1960.[4] Building upon his pledging experience, Abraham founded Paddle Tramps in 1961. Paddle Tramps's purpose was to provide materials to pledges for them to construct traditional decorative paddles. Generally, Paddle Tramps would provide fraternity and sorority members with blank paddles and various wooden figures with which to decorate them, and the members themselves would glue the figures to paddle itself. The wooden figures sold by Paddle Tramps included individual Greek letters, which, while not indicating any Greek Organization individually, could be combined to form the Greek letter insignia of a fraternity or sorority. More controversially for the purpose of this litigation, Paddle Tramps sold carved wooden figurines that were replicas of the crests or symbols within the crests of individual Greek Organizations.[5]

Abraham initially visited various Texas Tech fraternity and sorority houses showcasing his products, and took orders from Paddle Tramps's store location in Lubbock. By 1964, Paddle Tramps had opened a shop in Lubbock, Texas, and arranged for manufacturing of products in Lubbock and shipping the products to customers. As the 1960s progressed, Paddle Tramps's business expanded outside of the state of Texas. Paddle Tramps utilized its own catalogs and traveling salesmen to contact fraternity and sorority chapters at various schools to advertise their products. Paddle Tramps also published a catalog of its products in 1966, which advertised various products that specifically identified the Greek Organizations to which they were tailored.

Eventually, Paddle Tramps began wholesaling its products to stores and retail outlets. Kenneth Abraham's testimony indicates that he was selling products for all of the Greek Organizations who are parties to this lawsuit by 1966, and corresponded with members of a number of these organizations. In the 1960s and 1970s, Paddle Tramps began wholesaling its products to third party stores throughout the country, and participating in various trade shows. At no point during this early period of its existence did Paddle Tramps attempt to enter into a licensing agreement with any of the Greek Organizations. Conversely, the Greek Organizations did not reach out to Paddle Tramps about obtaining a license to sell products bearing the Greek Organizations' names, insignia, or crests until the 1990s.[6]

### C. The Greek Organizations' Licensing Efforts

In the first few decades of Paddle Tramps's existence, certain individual

---

4. Phi Gamma Delta is not a party to this action.

5. As discussed further below, the Greek Organizations do not appear to challenge Paddle Tramps's practices of selling blank paddles and wooden figures of individual Greek letters. Instead, the Greek Organizations' complaints are aimed at Paddle Tramps's sale of wooden replicas of their crests or figures within their crests, as well as the use of the Greek Organizations' names and insignia in their sales efforts.

6. The history of communications and disputes between Paddle Tramps and the Greek Organizations is ultimately most relevant to Paddle Tramps's defenses of laches and acquiescence, which were raised in Paddle Tramps's Motion for Summary Judgment. As this Order does not address that Motion, the Court shall not review those facts in great depth here.

Greek Organizations contacted Paddle Tramps about entering into licensing programs for the use of their marks or about controversies related to Paddle Tramps's use of the marks of certain Greek Organizations in its advertising efforts. These communications frequently led to compromise or resolution without litigation.

In the 1990s, the Greek Organizations began to increase their vigilance in policing their marks. At present, each of the Greek Organizations has a licensing program, and hundreds of vendors are licensed to produce memorabilia containing their Greek letter combinations, insignia, crests, and symbols. The Greek Organizations hired Affinity Marketing Consultants ("AMC") to manage their licensing programs, which include over 10,000 licensing agreements with numerous authorized vendors to sell merchandise containing their Greek letter combinations, insignia, crests, and symbols. Most vendors of such merchandise are now licensed, as Kyle Abraham, the son of Paddle Tramps's founder and an officer of Paddle Tramps, admitted in his deposition. Products licensed by the Greek Organizations are identified by a stylized symbol, which consists of a circle bordered by the characters of the Greek Alphabet and containing the words "Greek Licensed Product" in the center. *See* Defs.' App., Docket No. 55–20, at 309–10.

As part of their efforts to educate their members about licensing, the Greek Organizations have sent notices to members urging them to only purchase products bearing their Greek letter combinations, insignia, crests, and symbols from licensed vendors. This effort involves posting such information on the Greek Organizations' websites, publishing the information in fraternity and sorority newsletters, presenting the information at leadership conferences and in new member educational sessions, and through emails, letters, and flyers distributed to their members.

Despite various offers and attempts to get Paddle Tramps to become licensed with the Greek Organizations, Paddle Tramps has refused to do so and insisted that it was legally entitled to continue in its business without licenses from the Greek Organizations. After substantial correspondence and requests by the Greek Organizations to cease using their marks, this litigation ensued.

### D. Disputes Regarding Paddle Tramps's Manufactured Figures

There is no dispute between the parties regarding some of the figures sold by Paddle Tramps. For example, Paddle Tramps manufactures individual Greek letters, which in combination can be used to put together the name or Greek letter insignia of one of the Greek Organizations. The Greek Organizations do not argue that such products infringe on any protected trademark.[7] Additionally, the Greek Organizations do not contest Paddle Tramps's production of items unrelated to fraternities and sororities.

Instead, the Greek Organizations' protests relate to figures of certain shapes and designs produced by Paddle Tramps. Each of the 32 Greek Organizations possess a crest, most of which have been successfully registered as trademarks, and many of them have symbols associated with their organizations, most of which have also been successfully registered as

---

**7.** The Greek Organizations note that the Southern District of Florida has held that fraternity and sorority organizations own no proprietary right in individual Greek letters, which are used within the names of multiple such organizations. *Sigma Chi Fraternity v. Sethscot Collection*, No. 98–2102–CIV–SEITZ, 2000 WL 34414961, at *10–*11, 2000 U.S. Dist. LEXIS 6332, at *33–*34 (S.D.Fla. Apr. 7, 2000).

trademarks. Paddle Tramps manufactures a number of figures that it claims to be generic symbols such as stars, hearts, kites, and crescent moon figures, but the Greek Organizations assert that these alleged "generic" figures are "not simple common generic shapes," but are "copied from emblems unique to various of the Greek Organizations." Defs.' Br. in Support of Mot. for Summ. J., Docket No. 55, at 10.[8]

In support of their argument, the Greek Organizations provide images of their own trademarks of various shapes and figures, *see* Defs.' Answer & Countercl., Docket No. 4, at 4–54, as well as images of the wooden figures produced by Paddle Tramps that they allege infringe upon the Greek Organizations' trademarks. *See* Defs. App., Docket Nos. 55–4 to 55–14. The Greek Organizations allege that Paddle Tramps's crafted figures are identical or extremely similar to their own trademarks.

### E. Disputes Regarding Paddle Tramps's Advertising and Online Activities

In 1997, Paddle Tramps founded a website (www.paddletramps.com). At first, the website merely provided information about Paddle Tramps's products. In 2001, Paddle Tramps began selling products directly from its website. Defendants allege that Paddle Tramps's objectionable behavior regarding the use of the Greek Organizations' names and insignia began at this point. Paddle Tramps began selling kits bearing the names of specific Greek Organizations and including a blank paddle and all of the letters, symbols, and other figures necessary for a member of a Greek Organization to decorate the paddle so it would be tailored to the member's fraternity or sorority. These "paddle kits" were advertised with the names of the Greek Organizations on Plaintiff's website. For example, a "Phi Delta Theta Paddle Kit" would include a blank paddle and all of the pieces needed to construct a paddle for a Phi Delta Theta member. The member could order the paddle kit with all of the materials without the need of ordering all of the necessary pieces individually. These materials were also sold in this method at Paddle Tramps's retail outlet in Lubbock, Texas. The Greek Organizations have also alleged that Paddle Tramps has purchased keyword advertising code from Internet search engines and service providers and has embedded the keyword of the Greek Organizations in its website, so that a search for that Greek Organization and the materials necessary to construct a paddle would appear at the top of any Internet search.[9] The Greek Organizations allege that these activities and uses of their names and insignia constitute trademark infringement.

### II. Procedural History

Paddle Tramps filed this lawsuit on April 3, 2008, seeking a declaratory judgment that Paddle Tramps had not infringed upon any trademark rights of the Greek Organizations and that the Greek Organizations' failure to control the use of their marks for decades foreclosed any recovery for infringement by the Greek Organizations. On May 30, 2008, the Greek Organizations raised counterclaims for federal trademark infringement and unfair competition under the Lanham Act, common law unfair competition, and trademark dilution

---

**8.** Examples of Paddle Tramps's manufactured figures seen side by side with several Greek Organizations' crests and symbols are provided at pages 10 and 11 of the Greek Organizations' Brief in Support of their Motion for Summary Judgment (Docket No. 55).

**9.** The Greek Organizations have provided examples of this keyword coding at Docket No. 55–4.

under Texas state law. Aside from injunctive relief, the Greek Organizations seek damages only for royalties that should have been paid four years prior to the filing of the lawsuit.

The Greek Organizations note that the target of their suit is not Paddle Tramps's sale of blank paddles or individual Greek letters. Instead, the Greek Organizations' counterclaim challenges two of Paddle Tramps's practices: (1) the use of the names, insignia, or other indicators of the Greek Organizations in Paddle Tramps's advertising, including Internet advertising, and (2) the portion of Paddle Tramps's product sales of (a) items which actually contain insignia specific to any of the Greek Organizations, (b) specific products advertised using the names, insignia, or unique letter combinations of the Greek Organizations, such as the "paddle kits," and (c) replicas of the Greek Organizations' trademarked symbols, including wood-carved replicas of the Greek Organizations' crests and other of the Greek Organizations' emblems. The Greek Organizations allege that a judgment on this issue would only affect 2.4% of Paddle Tramps's business. However, Paddle Tramps claims that its business is nearly entirely dependent upon the use of the marks, and that an unfavorable decision would drastically affect its business as a going concern.

The Greek Organizations' Motion for Summary Judgment seeks summary judgment on the issues of liability and an accounting. Specifically, the Greek Organizations contend that there is no genuine issue of material fact regarding whether Paddle Tramps was engaged in trademark infringement, unfair competition, and trademark dilution under federal and state law. The Greek Organizations also seek injunctive relief in the instant Motion, but do not seek summary judgment on the issue of damages.

### III. Summary Judgment Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Willis v. Coca Cola Enters., Inc.*, 445 F.3d 413, 416 (5th Cir. 2006). A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment can be appropriate if the non-moving party "fails to make a showing sufficient to establish the existence of an essential element to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). At this stage, all evidence and reasonable inferences to be drawn therefrom must be viewed in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

### IV. Trademark Infringement and Unfair Competition

A trademark is "any word, name, symbol, or device, or any combination thereof ... to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. The purpose for bringing a cause of action for trademark infringement under the Lanham Act is to "secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 774, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (citations omitted).

The Greek Organizations bring claims for trademark infringement, unfair competition, and trademark dilution. The Greek Organizations' claims for trademark infringement under Section 32(1) of the Lanham Act and for unfair competition under both Section 43(a) of the Lanham Act and Texas law are governed under the same test. *Amazing Spaces, Inc. v. Metro Mini Storage,* 608 F.3d 225, 235 n. 7 (5th Cir. 2010). To succeed on their claims of trademark infringement and unfair competition, the Greek Organizations first must show that they have ownership in a legally protectable mark. *Elvis Presley Enters. v. Capece,* 141 F.3d 188, 194 (5th Cir.1998). They must then show infringement by demonstrating a likelihood of confusion as to the source, affiliation, or sponsorship of the merchandise. *Board of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel,* 550 F.3d 465, 474 (5th Cir.2008); *American Rice, Inc. v. Producers Rice Mill, Inc.,* 518 F.3d 321, 329 (5th Cir.2008).

■ As an initial matter, Paddle Tramps notes that several of the marks at issue are unregistered, specifically those belonging to Lambda Chi Alpha, Delta Tau Delta, and Kappa Alpha. However, this does not affect the Court's analysis for the purposes of this Order. "Ownership of trademarks is established by use, not by registration." *Union Nat'l Bank of Texas,*

*Laredo v. Union Nat'l Bank of Texas, Austin,* 909 F.2d 839, 842 (5th Cir.1990). Thus, a mark need not be registered in order to obtain protection. *Smack Apparel,* 550 F.3d at 475. While registration of a trademark is a prerequisite for recovery under 15 U.S.C. § 1114, the Greek Organizations may obtain relief relating to an unregistered trademark under 15 U.S.C. § 1125. *Boston Prof'l Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.,* 510 F.2d 1004, 1010 (5th Cir.1975). Furthermore, "[t]he same tests apply to both trademarks and trade dress to determine whether they are protectible and whether they have been infringed, *regardless of whether they are registered or unregistered.*" *Pebble Beach Co. v. Tour 18 I Ltd.,* 155 F.3d 526, 536 (5th Cir.1998) (emphasis added). Therefore, the Greek Organizations can still pursue relief for their unregistered marks under 15 U.S.C. § 1125 if they are entitled to protection.

The Court further notes that the registered or unregistered nature of the trademarks is important to the Court's analysis of whether the marks are legally protectable, but the Court's analysis shall proceed regardless of the trademarked status of the mark. Many of the marks at issue in this case are registered with the PTO. *See* Defs.' App., Docket No. 55, at 730–994.[10] As the Greek Organizations cor-

---

10. Paddle Tramps objects to the use of these documents because the Greek Organizations have not provided any evidence that the requirements to maintain the trademarks were followed. Thus, Paddle Tramps claims that the registrations are irrelevant as to whether the trademarks are still valid or subsisting. The Court rejects these arguments. The admissibility of trademark registrations is explicitly provided for in the Lanham Act:

Any registration issued under the Act of March 3, 1881, or the Act of February 20, 1905, or of a mark registered on the principal register provided by this chapter and owned by a party to an action shall be admissible in evidence and shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein, but shall not preclude another person from proving any legal or equitable defense or defect ... which might have been asserted if such mark had not been registered.

15 U.S.C. § 1115(a). Therefore, Paddle Tramps's objection is overruled.

rectly note, 15 U.S.C. § 1115(a) provides that a federal registration of a trademark consists of prima facie evidence of the validity and ownership of the mark. 15 U.S.C. § 1065 further provides that the fact that many of these registrations are more than five years old, the registrations are now "incontestible," making the registrations "conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the mark in commerce." 15 U.S.C. § 1115(b).

An analysis under these statutory provisions is helpful to the Court in this litigation. However, several reasons prompt the Court to forego this step at this stage. First, because many of the marks have different histories, registration dates, and uses, the Court's analysis shall not be uniform to each of the dozens of marks asserted in this litigation. Second, an analysis based on these statutory provisions is unnecessary at this stage because the Court can make a determinative decision on the issue of infringement, regardless of the registered or unregistered nature of the marks, on other substantive grounds described below. Third, while this statutory analysis may be helpful in assessing the remedies available in this litigation, the Court shall refrain from making such an analysis at this stage because, as recounted elsewhere in this Order, Paddle Tramps's Motion for Summary Judgment regarding its defenses remains pending.

Paddle Tramps further argues that the Court should disregard some of the trademarks asserted by the Greek Organizations because Paddle Tramps has not produced any products that have infringed upon them. At this stage, the Court finds this fact to be of no consequence. In fact, as shown below, Paddle Tramps admits to manufacturing products containing the marks of the Greek Organizations; the

fact that their actions only address some of the marks listed in the Complaint rather than all of them is not relevant to the Court's analysis at this stage. The Court's sole concern here is whether Paddle Tramps committed trademark infringement through the use of the Greek Organizations' marks. If this situation requires further review if and when the Court addresses the issue of the scope of the Greek Organizations' potential remedies, the Court shall instruct the parties to submit specific briefing on that issue at that time.

### A. Legally Protectable Marks

■■■ "The Lanham Act provides that a trademark may be 'any word, name, symbol, or device, or any combination thereof' that is used or intended to be used 'to identify and distinguish' a person's goods 'from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.'" *Smack Apparel,* 550 F.3d at 475 (quoting 15 U.S.C. § 1127). To determine if a mark is legally protectable, "a court must look at the functionality, distinctiveness, and secondary meaning" of the mark. *Dallas Cowboys Football Club, Ltd. v. America's Team Props., Inc.,* 616 F.Supp.2d 622, 634 (N.D.Tex.2009) (Kinkeade, J.). A mark is protectable if it is either (1) inherently distinctive, or (2) has become distinctive through a secondary meaning. *Id.* (citing *Two Pesos,* 505 U.S. at 769, 112 S.Ct. 2753).

■■■ A product is inherently distinctive if its "intrinsic nature serves to identify a particular source." *Wal–Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 210, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000). "Inherent distinctiveness is attributable to a mark when the mark 'almost *automatically* tells a customer that it refers to a brand ... and immediately signal[s] a brand or product source.'"

*Amazing Spaces, Inc. v. Metro Mini Storage,* 608 F.3d 225, 240 (5th Cir.2010) (quoting *Wal–Mart Stores,* 529 U.S. at 212, 120 S.Ct. 1339) (emphasis in original). To demonstrate secondary meaning, a party must show that, "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself." *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982).

The parties urge the Court to follow the Fifth Circuit cases that have applied a familiar test in which a mark could be classified as (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. *Xtreme Lashes, LLC v. Xtended Beauty, Inc.,* 576 F.3d 221, 227 (5th Cir.2009) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992)). The Fifth Circuit has defined these five classifications as follows:

A *generic* term is the name of a particular genus or class of which an individual article or service is but a member. A generic term connotes the basic nature of articles or services rather than the more individualized characteristics of a particular product.... Such terms as aspirin and cellophane have been held generic and therefore unprotectable as trademarks.

A *descriptive* term identifies a characteristic or quality of an article or service, such as its color, odor, function, dimensions, or ingredients.... Examples of descriptive marks would include Alo with reference to products containing gel of the aloe vera plant and Vision Center in reference to a business offering optical goods and services....

A *suggestive* term suggests, rather than describes, some particular characteristic of the goods or services to which it applies and requires the consumer to exercise the imagination in order to draw a conclusion as to the nature of the

goods and services.... The term Coppertone has been held suggestive in regard to sun tanning products.

*Arbitrary ox fanciful* terms bear no relationship to the products or services to which they are applied.... The term Kodak is properly classified as a fanciful term for photographic supplies; Ivory is an arbitrary term as applied to soap.

*Amazing Spaces,* 608 F.3d at 241 (quoting *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.,* 698 F.2d 786, 790–91 (5th Cir.1983)). Because this test largely became prominent through its use in Judge Friendly's opinion in *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4 (2d Cir. 1976), this test is often referred to as the *Abercrombie* test.

"[W]ithin this spectrum the strength of a mark, and of its protection, increases as one moves away from generic and descriptive marks toward arbitrary marks." *Falcon Rice Mill, Inc. v. Cmty. Rice Mill, Inc.,* 725 F.2d 336, 346 (5th Cir.1984). Marks classified as belonging to one of the latter three categories are considered inherently distinctive, and therefore entitled to protection, because their intrinsic nature serves to identify a particular source of a product. *Xtreme Lashes,* 576 F.3d at 227. Generic terms are not entitled to protection, and descriptive terms are only entitled to protection if they have acquired secondary meaning. *Id.*

In this case, there are several different kinds of trademarks at issue. In a recent decision, the Fifth Circuit noted that courts may need to apply different legal tests to word marks as opposed to marks consisting of symbols and designs. *Amazing Spaces,* 608 F.3d at 243. Here, the Greek Organizations are attempting to protect their rights in two different kinds of marks. First, they are attempting to halt Paddle Tramps from using the combinations of Greek letters by which each

individual organization is identified in selling their products (i.e., "Alpha Chi Omega," "Delta Delta Delta," etc.), or the insignia of the Greek Organizations, which are constructed using the combinations of the individual Greek letters (i.e., "AKΩ," "ΔΔΔ," etc.). These are referred to in the Greek Organizations' counterclaims as "word marks." Second, the Greek Organizations are attempting to prevent Paddle Tramps from infringing upon certain "graphic designs" affiliated with each Greek Organization, many of which contain the Greek Organizations' crests or figures within them. These marks include a number of symbols and the Greek Organizations' crests. As each of these kinds of marks invoke different questions over recognition, the Court may need to apply a different analysis as to the inherent distinctiveness of each of these different kinds of marks. Accordingly, the Court will address the word marks and the marks containing graphic designs in turn.

The Greek Organizations and Paddle Tramps argue that the word marks at issue are at completely opposite sides of this spectrum. The Greek Organizations assert that the marks consisting of their names should be classified as arbitrary or fanciful, and therefore entitled to the strongest protection. By contrast, Paddle Tramps claims that the Greek Organizations' names and insignia, as mere combinations of Greek letters, are only entitled to generic classification. Paddle Tramps objects to the Greek Organizations' argument that their names and Greek letter insignia should be classified as "fanciful," which could entitle the marks to the greatest possible strength on the spectrum. "Fanciful terms are most often coined words such as 'Xerox' or 'Kodak.'" *Union Nat'l Bank,* 909 F.2d at 845 (citations omitted); *see also Abercrombie & Fitch,* 537 F.2d at 11 n. 12 (defining "the term 'fanciful,' as a classifying concept, is usually applied to words invented solely for

their use as trademarks"). It is clear that the words used to identify Greek Organizations were not coined for that use; indeed, the existence of the letters long predates the existence of the Greek Organizations. Therefore, the Court agrees with Paddle Tramps that the Greek Organizations' names and insignia are not "fanciful."

However, while the strength of the marks at issue does not rise to the highest level of a "fanciful" classification, the Court agrees with the Greek Organizations' contention that their names and insignia are inherently distinctive and therefore entitled to protection. The Court is of the opinion that the most appropriate classification for their names is "arbitrary" and are therefore legally protectable. In *Union National Bank,* the Fifth Circuit provided that, while "fanciful" terms tended to be "coined words," the term "arbitrary" refers to "ordinary words which do not suggest or describe the services involved." *Union Nat'l Bank,* 909 F.2d at 845; *see also Abercrombie & Fitch,* 537 F.2d at 11 n. 12 ("When the same legal consequences attach to a common word, i.e., when it is applied in an unfamiliar way, the use is called 'arbitrary.'"). Combinations of Greek letters have become synonymous with sorority or fraternity organizations, although by themselves Greek letters do not indicate this in any way. Each of the individual Greek Organizations has chosen a combination of Greek letters that, by themselves, do not indicate that they are a sorority or fraternity. The Greek letter combinations are, therefore, the use of common words in an unfamiliar way, and these marks are entitled to an "arbitrary" classification. *See Sport Supply Grp., Inc. v. Columbia Cas. Co.,* 335 F.3d 453, 460 n. 7 (5th Cir.2003).

■ Regardless of the exact classification, however, it is clear that the Greek Organizations' marks are inherently dis-

tinctive and therefore are legally protectable. These unique Greek letter combinations automatically tell consumers the source of the mark because it is the very name of the Greek Organization. In the context of the facts of this case, in which Paddle Tramps's products are sold wholesale to stores that specifically cater to members of Greek Organizations, it is clear that the word marks asserted by the Greek Organizations are immediately recognizable by the public and target customers as originating from the individual Greek Organizations. Therefore, the word marks are inherently distinctive and entitled to protection.

Paddle Tramps argues that the marks should receive a weak classification because they have been different combinations of Greek letters are used by dozens, if not hundreds, of organizations throughout the country, many of which are not represented by Affinity Marketing Consultants or are fraternity or sorority organizations at all. Paddle Tramps contends that "even if the Greek letter designations were not generic or weak when they were first adopted, they can become generic or weak in the minds of the public as generally designating undergraduate fraternities and sororities, regardless of the Greek Organizations' efforts." Pl.'s Resp., Docket No. 66, at 24. Paddle Tramps is perhaps correct that the use of various combinations of Greek letters, in the mind of the public, generally refers to fraternities or sororities. However, the Greek Organizations are not alleging infringement by Paddle Tramps's use of general combinations of Greek letters. Instead, they are challenging Paddle Tramps's use of *specific combinations* of Greek letters that represent a fraternity or sorority, which are distinguishable from other combinations of Greek letters and are instantly recognizable by their members. These various other non-party organizations may be using Greek letters, or several of the Greek letters, but they are not using the same combinations of Greek letters as each of the Greek Organizations.

While individual Greek letters may not be entitled to trademark protection, the combination of such common terms can create a valid trademark. *See Association of Co-op. Members, Inc. v. Farmland Indus., Inc.*, 684 F.2d 1134, 1140 (5th Cir. 1982) ("The whole, in trademark law, is often greater than the sum of its parts. Common words in which no one may acquire a trademark because they are descriptive or generic may, when used in combination, become a valid trademark."). Therefore, the Court must assess the marks as the distinct combinations of Greek letters, rather than as individual Greek letters or as random combinations. *See Estate of P.D. Beckwith, Inc. v. Comm'r of Patents*, 252 U.S. 538, 545–46, 40 S.Ct. 414, 64 L.Ed. 705 (1920) ("The commercial impression of a trade-mark is derived from it as a whole, not from its elements separated and considered in detail. For this reason it should be considered in its entirety . . ., and to strike out any considerable part of it, certainly any conspicuous part of it, would be to greatly affect its value.").

When considering the word marks as a whole, it is clear that the marks are inherently distinctive, particularly in the minds of the relevant consumers. Notably, the Court's judgment of whether a mark is enforceable goes to the "primary significance" of the mark to the "relevant public." 15 U.S.C. § 1064(3). Here, the "relevant public," the target consumers, are the members of the Greek Organizations; only those associated with the Greek Organizations, or perhaps their friends and family members, would purchase these products. It is further clear to the Court that members of these Greek Organizations can distinguish between the marks of

different Greek Organizations, even if they involve some of the very same letters. A member of Alpha Omicron Pi could certainly distinguish the mark of her organization from the mark of Alpha Delta Pi, despite the fact that they both contain two of the same letters.

The Court is also certain that a member of the general public can determine the difference between one combination of two or three Greek letters and another. Therefore, the Court does not find convincing Paddle Tramps's argument that the use of Greek letters by numerous organizations translates to the marks being inherently weak. The fact that many organizations use Greek letters in their names may serve to show that the marks are not fanciful or even arbitrary, but the mere existence of a plethora of organizations with Greek letters as the basis for their names does not mean that the individual combinations of Greek letters are not strong, distinctive, or inherently associated with a certain fraternity or sorority. The mere fact that combinations of Greek letters have become associated in the mind of the public with fraternities and sororities does not mean that a specific combination of Greek letters that has been used for decades and is readily associated with a specific organization by relevant consumers is not legally protectable. Therefore, it is clear to the Court that the primary significance of the mark to the target consumers reflects their own membership in and recognition of the symbols of their own organizations.[11]

■ The Court's analysis as to certain of the nicknames, such as "Pi Phi" or "Tekes," is slightly different, but the ultimate result is the same. Within the relevant market, it is clear that these marks are readily identifiable by the target customers. Members of these Greek Organizations would associate these more colloquial word marks with their own organization. Therefore, much of the above analysis appropriately applies to these word marks, and they are entitled to protection.

Accordingly, it is clear to the Court that the word marks are entitled to legal protection. However, the parties' dispute over use of the marks also goes to Paddle Tramps's production and sale of wooden figures containing the Greek Organizations' crests or symbols. The parties' arguments regarding these symbols and images have focused on the *Abercrombie* spectrum test noted above, but the Fifth Circuit has indicated that marks made of symbols or figures may be subject to a different standard than those of words. *Amazing Spaces*, 608 F.3d at 243. In *Amazing Spaces*, the Fifth Circuit affirmed a lower court's decision to refer to a test other than the *Abercrombie* test in assessing a mark that involved a symbol rather than a word. Courts and commentators have held noted that the *Abercrombie* test was developed and applied in reference to word marks, and that in many cases it may not apply to other marks consisting of color schemes, symbols, or geometric shapes. *See, e.g. Wal–Mart Stores*, 529 U.S. at 210–13, 120 S.Ct. 1339 (noting that the *Abercrombie* test was created and meant to be applied in the context of word marks and declining to apply it to a product design); 2 McCARTHY ON TRADEMARKS § 11:2, at 11–7 ("Use of the spectrum of descriptive, suggestive, arbitrary and fanciful is largely confined to word marks. It is usually not suitable for

---

11. In its briefing, Paddle Tramps in fact admits to this fact and its role as a motivation for its business, writing, "Paddle Tramps primarily sells its products wholesale, but the end market is always the same—members of the Greek Organizations." Pl.'s Reply Brief, Docket No. 70, at 6.

nonword designations such as shapes and images making up trade dress.").

In evaluating a mark consisting of a designed symbol, the *Amazing Spaces* court applied a test articulated by the United States Court of Customs and Patent Appeals, known as the *Seabrook Foods* test. The *Seabrook Foods* test provides:

In determining whether a design is arbitrary or distinctive this court has looked to [1] whether it was a "common" basic shape or design, [2] whether it was unique or unusual in a particular field, [3] whether it was a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods, and [4] whether it was capable of creating a commercial impression distinct from the accompanying words.

*Amazing Spaces*, 608 F.3d at 243 (quoting *Seabrook Foods, Inc. v. Bar–Well Foods Ltd.*, 568 F.2d 1342, 1344 (C.C.P.A.1978)). While *Amazing Spaces* acknowledged that this test would not be applied in all cases involving marks consisting of symbols, *id.*, the Court finds it appropriate to address both the *Abercrombie* and *Seabrook Foods* tests where necessary in this case.

The Greek Organizations generally assert two categories of marks. The first category consists of each Greek Organization's unique crest. The crests contain certain symbols and often the Greek letter insignia of the Greek Organization itself with whom the crest is associated.[12]

The second category consists of a number of symbols, including:

- a version of a harp for Alpha Chi Omega;
- a version of a lion's head with the words "Alpha Delta Pi" for Alpha Delta Pi;
- a stylized design of a letter "A" for Alpha Gamma Delta;
- a design including a crescent moon and sickle for Alpha Gamma Rho;
- a sheaf of wheat for Alpha Omicron Pi;
- a rose for Alpha Omicron Pi;
- a sheaf of wheat bundled with a rose for Alpha Omicron Pi;
- a graphic design containing the Greek letter "Alpha" superimposed upon the Greek letter "Phi" for Alpha Phi;
- a cross including the Greek letters "Alpha," "Tau," and "Omega" for Alpha Tau Omega;
- a banner-type lettering of the words "Beta Theta Pi" and "Men of Principle" for Beta Theta Pi;
- a gryphon for Beta Theta Pi;
- a shield with three stars within it and the letters "Beta," "Theta," and "Pi" for Beta Theta Pi;
- a stylized version of an owl for Chi Omega;
- a twelve-pointed star for Chi Phi;
- a symbol of a "Chi" superimposed upon a "Phi" for Chi Phi;
- a "Delta" superimposed upon a "Chi" for Delta Chi;
- a crescent moon containing three stars within it for Delta Delta Delta;
- a "Delta" with three smaller "Deltas" within it for Delta Delta Delta;

---

**12.** Images of the Greek Organizations' crests can be found in their counterclaim. *See* Defs.' Ans. & Countercl., Docket No. 4, at 4–54. While it is true that the pleadings are not summary judgment evidence, *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994), these images are contained elsewhere in the Greek Organizations voluminous appendix. The Court refers to the images in the Greek Organizations' pleadings as a matter of convenience.

- an anchor with a shield containing the letters "Delta" and "Gamma" for Delta Gamma;

- a "Delta" containing the letters "Delta," "Phi," and "Epsilon" within it sitting upon a platform for Delta Phi Epsilon;

- a four-side figure with sides curved inward containing symbols of stars, a crescent moon, and an eye and the letters "Delta," "Tau," and "Delta" for Delta Tau Delta;

- a shield containing a cross and the letters "Kappa" and "Alpha" for Kappa Alpha Order;

- two versions of a diamond with a cross and several letters within it for Kappa Delta;

- a star containing the letters "Kappa" and "Sigma" with a half circle and small skull-and-crossbones above it for Kappa Sigma;

- a triangle consisting of several figures, including what appear to be wings and a sword, for Kappa Sigma;

- a cross superimposed upon a crescent moon for Lambda Chi Alpha;

- a crescent moon with the letter "Lambda" superimposed upon the letters "Chi" and "Alpha" for Lambda Chi Alpha;

- a cross containing a six-pointed star, a skull-and-crossbones, and the letters "Phi," "Kappa," and "Sigma" for Phi Kappa Sigma;

- what appears to be a modified version of the letter "F" for Phi Kappa Sigma;

- a diamond with curved edges containing a heart and a shield with the letters "Phi," "Kappa," and "Theta" for Phi Kappa Theta;

- the words "Pi Beta Phi" with an arrow swooping upward for Pi Beta Phi;

- a diamond containing the letters "Pi," "Kappa," and "Alpha" with small ovals containing Greek letters coming out of its sides for Pi Kappa Alpha;

- an arrow Swith a chain handle and a back containing the letters "Pi," "Beta," and "Phi" for Pi Beta Phi;

- a diamond containing a bird clutching the previously-identified arrow for Pi Beta Phi;

- a diamond with the images of a man holding a staff and a kneeling lion beside him for Sigma Alpha Epsilon;

- a cross with chain links on the top and containing crossed keys, a scroll, a bird's head, shaking hands, and the letters "Sigma" and "Chi" for Sigma Chi;

- a shield with a cross within it for Sigma Chi;

- a round symbol with a candelabra and stars above it within it for Sigma Chi;

- a triangle bordered by curved edges with the letters "Sigma" and "Kappa" within it for Sigma Kappa;

- a triangle bordered by a circles with the letters "Sigma" and "Kappa" within it for Sigma Kappa;

- a circle symbol with a bird with wings outstretched and the Greek letters "Sigma" and "Kappa" within the circle for Sigma Kappa;

- a "Kappa" with a snake wrapped around it in the shape of a "Sigma" for Sigma Kappa;

- a circle with a man turned to the side and the words "The Balanced Man" in English and Greek for Sigma Phi Epsilon;

- an unclosed triangle with black stripe sides with the letters "Tau," "Kappa," and "Epsilon" within it for Tau Kappa Epsilon;

- a closed upside-down triangle with black stripe sides with the letters

"Tau," "Kappa," and "Epsilon" within it for Tau Kappa Epsilon;

- and a circle with three intertwined triangles and the words "Tau Kappa Epsilon" within it for Tau Kappa Epsilon.

*See* Defs.' Ans. & Countercl., Docket No. 4, at 4–54.

Often, a Greek Organization's symbol is contained within its own crest; for example, the knight's helmet used by Phi Kappa Theta is contained within its crest. Furthermore, most of these symbols explicitly contain the Greek letters consisting of the name of the individual Greek Organizations, or contain those letters spelled out. Other of the symbols have dates on them representing the years that the fraternities were established.

Paddle Tramps's use of the symbols and crests largely do not contain the words and at times do not contain the letters seen within the registered trademarks. As the Court notes below, however, the symbols themselves are still identifiable with the Greek Organizations, and, in any case, Paddle Tramps notes its own "consistent use" of these marks, which it acknowledges identify the Greek Organizations, elsewhere in its briefing. Pl.'s Reply, Docket No. 70, at 4–6.

■ Ultimately, regardless of whether the Court uses the *Abercrombie* or *Seabrook Foods* tests, the Greek Organizations' crests and symbols are entitled to legal protection. Under the *Abercrombie* test, all of the Greek Organizations' symbols consist of shapes or figures that have nothing to do with their status as fraternities or sororities. An image of a sheaf of wheat, knights' helmet, or arrow do nothing to signify a characteristic or quality of a fraternity or sorority organization. Therefore, as the district court in *Amazing Spaces* concluded, under the *Abercrombie* test, the Greek Organizations' various symbols, as used by Paddle

Tramps, cannot be given a classification of "generic" because they do not "connote the basic nature of articles or services" of fraternity or sorority organizations in general. *Amazing Spaces*, 608 F.3d at 242. Furthermore, the various symbols do not "identify a characteristic or quality" of fraternity or sorority organizations; therefore, a "descriptive" classification would also be inappropriate. *Id.* Additionally, the various symbols do not "suggest an attribute" of fraternity or sorority organizations; therefore, a suggestive classification would also not be appropriate. *Id.*

After determining that a certain symbol did not fit into the generic, distinctive, or suggestive classifications, the Fifth Circuit in *Amazing Spaces* approved of the district court's subsequent shift to the *Seabrook Foods* test to determine whether the marks were entitled to protection. In this case, however, the Court shall evaluate the symbols under both the *Abercrombie* and *Seabrook Foods* tests. If the Court were to use the *Abercrombie* test, as promoted by the parties, it appears here that the symbols themselves are entitled to an "arbitrary" classification. The various symbols, such as a sheaf of wheat, arrow, knight's helmet, lion's head, rose, or cross, among others, have no relation at all to a fraternity or sorority organization. The use of such figures in association with these organizations that are in no way associated with the subject matter of the figures entitles these marks to an arbitrary classification. An example of a similar "arbitrary" mark provided by the Fifth Circuit is an Apple Computer; the use of the word and symbol of an apple has nothing whatsoever to do with a computer, and such a mark would properly be classified as "arbitrary." *See Sport Supply*, 335 F.3d at 460 n. 7. The Court finds this commonly-used example particularly instructive for the purpose of evaluating these marks un-

der the *Abercrombie* test, and is convinced that such guidance compels the Court to conclude that the symbols are arbitrary. Under the *Abercrombie* test, therefore, these marks are inherently distinctive.

 Despite this conclusion under the *Abercrombie* test, the Court finds the guidance of *Amazing Spaces* helpful in this case, and shall also evaluate the symbols under the *Seabrook Foods* test. As mentioned above, the relevant factors of the *Seabrook Foods* test that the Court must consider include (1) whether the symbols were common basic shapes or designs, (2) whether the symbols are unique or unusual in a particular field, and (3) whether the symbols were mere refinements of commonly-adopted and well-known forms of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods. *Amazing Spaces*, 608 F.3d at 243 (quoting *Seabrook Foods*, 568 F.2d at 1344).[13] These questions "are merely different ways to ask whether the design, shape or combination of elements is so unique, unusual or unexpected in this market that one can assume without proof that it will automatically be perceived by customers as an indicator of origin-a trademark." *Id.* at 243–44 (quoting *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 40 (1st Cir.1998)).

 After evaluating the symbols using these factors, the Court is of the opinion that the symbols at issue are indicators of origin and thus trademarks entitled to legal protection. First, the Court is of the opinion that the designs themselves cannot be classified as "common" in this context. " 'Common basic shapes' or

letters are, as a matter of law, not inherently distinctive ..., [but] stylized shapes or letters may qualify, provided the design is not commonplace but rather unique or unusual in the relevant market." *Amazing Spaces*, 608 F.3d at 244 (quoting *Star Indus. v. Bacardi & Co.*, 412 F.3d 373, 382 (2d Cir.2005)). While the symbols themselves largely are based upon commonly-known shapes or figures such as a rose, cross, or owl, they often have their own unique elements within their design; the arrow of Pi Beta Phi, for example, has a handle along its bottom, and the cross used by Sigma Chi has curved edges, unlike most crosses. Furthermore, one cannot say that these marks are commonly used amongst fraternity and sorority organizations; indeed, each Greek Organization has unique features by which it seeks to create a unique identity.

 It is clear that these symbols are "stylized," and therefore not "common" under the *Seabrook Foods* test's definition, particularly considering the second factor of the uniqueness within the market in which the products are sold. Were the rose symbol of Alpha Omicron Pi to be used by a florist's business, the stylized owl of Chi Omega used by a zoo in its identifying logo, or the knight's helmet within the crest of Phi Kappa Theta used for a Renaissance Fair's logo, for example, the symbols themselves would not be unique within their own market. However, among the relevant base of customers, conceded by Paddle Tramps to be members of the Greek Organizations and their families, it is clear that the symbols are inherently distinctive. A symbol is inherently distinctive if it is "so unique, unusu-

---

**13.** The fourth factor, "whether [the symbol or design] was capable of creating a commercial impression distinct from the accompanying words," only applies "when a party seeks trademark protection for a background design typically accompanied by words." *Amazing*

*Spaces*, 608 F.3d at 243 n. 14. While many of the crests contain the Greek letter insignia of its accompanying Greek Organization, a majority of the symbols at issue do not. Therefore, the Court shall not apply this factor in regard to the symbols.

al, or unexpected *in this market* that one can assume without proof that it will automatically be perceived by customers as an indicator of origin—a trademark." *Amazing Spaces,* 608 F.3d at 247 (quoting *I.P. Lund Trading ApS,* 163 F.3d at 40) (emphasis added). To these customers, it is clear that they would recognize these symbols as by their intrinsic nature serving to identify a particular source because they are members of the Greek Organizations that have designed them or adopted them as a symbol. *Wal–Mart,* 529 U.S. at 210, 120 S.Ct. 1339; *Amazing Spaces,* 608 F.3d at 247. A member of Alpha Chi Omega, for example, would immediately associate Paddle Tramps's wooden carving of a specifically shaped lyre contained within the Alpha Chi Omega crest with Alpha Chi Omega itself, and would know that the product's design originated with that fraternal organization. The same recognition would be present for a member of Alpha Omicron Pi who saw a wooden carving of a rose or sheaf of wheat, a member of Phi Kappa Sigma who saw a wooden carving of their fraternity's unique stylization of an "F" whose trademark has been registered, or a member of Pi Beta Phi who saw a wooden carving of the uniquely shaped and featured arrow that their sorority uses. These symbols would be recognized by members of the Greek Organizations even though many of the products produced by Paddle Tramps do not contain the Greek letters contained on the registered trademarks; these members would certainly identify the shapes with their fraternities whether those letters were present or not. In sum, application of the *Seabrook Foods* test indicates that the symbols are inherently distinctive.

■ The Greek Organizations' crests are also entitled to legal protection because they largely contain marks that the Court has identified as inherently distinctive: the Greek combinations of letters unique to each Greek Organization and the symbols described above. While each Greek Organization uses a crest, it is clear that, to the relevant market, members of each individual Greek Organization would be able to identify his or her own Greek Organization's crest, and therefore identify the Greek Organization as the source or originator of the mark. Thus, like the symbols, the crests are inherently distinctive and are legally protectable trademarks.

Regardless of the exact test used, the Court finds *Smack Apparel* instructive here. In *Smack Apparel,* the Fifth Circuit, discussing the sale of items containing distinguishing marks associated with college sports teams, wrote:

> [T]eam emblems and symbols are sold because they serve to identify particular teams, organizations, or entities with which people wish to identify.... We think this desire by consumers to associate with a particular university supports the conclusion that team colors and logos are, in the minds of the fans and other consumers, source indicators of team-related apparel.

*Smack Apparel,* 550 F.3d at 477–78 (citing *Boston Hockey,* 510 F.2d at 1011). The same logic applies to potential customers in this case. Products containing a fraternity or sorority's names or insignia are sold because those buying them wish to identify themselves with that organization. Kenneth Abraham stated that new members of fraternities and sororities "get so excited when they pledge" and that they "want stuff" related to their new organization. Def.'s App., Docket No. 55–1, at 34–36. Similar to the emblems or symbols of sports teams, new members' desire to associate with their new fraternity or sorority fuels their desire to purchase items with their sorority's name or insignia on them, and supports the conclusion that the Greek letters on those products are "source indi-

cators" that the products are related to the respective fraternity or sorority. *Smack Apparel*, 550 F.3d at 478. Such logic applies to both the word marks and the relevant symbols. It is clear that the presence of the marks trigger the purchase of Paddle Tramps's merchandise at issue.

Paddle Tramps further argues that the Greek Organizations' failure to enforce their marks over the past several decades have weakened their marks to such an extent that they are not entitled to legal protection. The Court is not convinced by this argument. "[A] trademark owner's failure to pursue potential infringers does not in and of itself establish that the mark has lost its significance as an indicator of origin," *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1080 (5th Cir.1997). In any case, Paddle Tramps has presented nothing to the Court to indicate that the marks themselves have been so weakened by unauthorized and unpursued infringing use that they have lost their inherent distinctiveness in relation to their affiliation with individual Greek Organizations. Although Paddle Tramps continuously references the Greek Organizations' delay in policing their marks, such behavior is not relevant to whether the marks are legally protectable. "Even if the trademark owner is 'not assiduous,' such inaction is only relevant to an affirmative defense of laches...." *Dallas Cowboys*, 616 F.Supp.2d at 634 (quoting *Ill. High Sch. Ass'n v. GTE Vantage, Inc.*, 99 F.3d 244, 246 (7th Cir.1996)). As discussed elsewhere in this Order, whether laches applies in this case shall be addressed in a separate order.

In sum, the Court concludes that the Greek Organizations' word marks, crests, and symbols are inherently distinctive, and therefore entitled to legal protection.

### B. Likelihood of Confusion

The Court now addresses whether Paddle Tramps's use of the mark "creates a likelihood of confusion in the minds of potential customers as to the source, affiliation, or sponsorship" of the products at issue. *Elvis Presley*, 141 F.3d at 193. "Likelihood of confusion is synonymous with a probability of confusion, which more than a mere possibility of confusion." *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 663–64 (5th Cir.2000). Courts must consider the following non-exhaustive list of factors in determining the likelihood of confusion: (1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, and (7) any evidence of actual confusion. *Id.* at 664. The Fifth Circuit also recently identified an eighth factor of "the degree of care exercised by potential purchasers." *Smack Apparel*, 550 F.3d at 478 (citing *American Rice*, 518 F.3d at 329). No single factor is dispositive, and a finding of likelihood of confusion need not be supported by a majority of these factors. *Westchester Media*, 214 F.3d at 664. The Court may also consider other relevant factors in determining whether a likelihood of confusion exists. *Elvis Presley*, 141 F.3d at 194. "While the likelihood of confusion is typically a question of fact, summary judgment is proper if the 'record compels the conclusion that the movant is entitled to a judgment as a matter of law.'" *Xtreme Lashes*, 576 F.3d at 227 (quoting *Smack Apparel*, 550 F.3d at 474).

#### 1. The Type of the Mark Allegedly Infringed

The type of the mark allegedly infringed refers to "the strength of the mark."

*Smack Apparel*, 550 F.3d at 478–79. "Generally, the stronger the mark, the greater the likelihood that consumers will be confused by competing uses of the mark." *Id.* at 479. Strength of the mark is determined by two factors: (1) the mark's classification into one of five categories, each of which is entitled to a different level of protection, and (2) the standing of the mark in the marketplace. *American Rice*, 518 F.3d at 330. As discussed below, the Court is of the opinion that the Greek Organizations' marks are strong, and that this factor supports a likelihood of confusion.

As mentioned above, "[m]arks are normally assigned to 'categories of generally increasing distinctiveness': (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful." *Xtreme Lashes,* 576 F.3d at 227 (quoting *Two Pesos,* 505 U.S. at 768, 112 S.Ct. 2753). The word marks have been classified as arbitrary, and the designs have acquired secondary meaning to such an extent that they are entitled to strong legal protection.

 Regarding the standing of the mark in the marketplace, Paddle Tramps reiterates its argument that the widespread unlicensed use of the marks for decades diminishes the strength of the marks themselves as identifiers of the Greek Organizations. However, "the key is whether the third-party use diminishes in the public's mind the association of the mark with the plaintiff." *Smack Apparel,* 550 F.3d at 479. As in *Smack Apparel,* widespread third-party use of the Greek Organizations' marks does not create an issue of fact concerning the public's association between the Greek Organizations and the Greek letter combinations "that clearly reference" the individual Greek Organizations. *Id.* In fact, Paddle Tramps's use of the marks in this case reference the trademark owners even more than the use of several universities' marks in *Smack*

*Apparel.* In *Smack Apparel,* the alleged infringer used color schemes associated with the universities combined with phrases that referenced the accomplishments of those schools' football teams. *Id.* at 472–73. In this case, Paddle Tramps uses the exact names of the Greek Organizations to sell their paddle kits, and uses symbols that are, more the most part, either registered trademarks of the Greek Organizations, or are figures within the crests of the Greek Organizations, which in and of themselves are registered trademarks.

In further support of its contention of the weakness of the Greek Organizations' marks, Paddle Tramps asserts that the *Sigma Chi* court recognized that individual fraternities and sororities could not claim a "strong, distinctive mark" in their Greek letter identifications because of the existence of numerous Greek organizations. However, Paddle Tramps leaves out the fact that the *Sigma Chi* court undertook this analysis in regard to a claim of *trademark dilution,* which that court specifically said "does not hinge upon proof of a likelihood of confusion." *Sigma Chi,* 2000 WL 34414961 at *10, 2000 U.S. Dist. LEXIS 6332 at *31 (citing *Nailtiques Cosmetic Corp. v. Salon Sciences Corp.,* No. 96–2709–CIV–NESBITT, 1997 WL 244746, at *4, 1997 U.S. Dist. LEXIS 4662, at *4 (S.D.Fla. Jan. 10, 1997)). Indeed, the *Sigma Chi* court noted that an analysis of a mark's distinctiveness in a particular market has separate significance than the "famous and distinctive" inquiry regarding a claim for trademark dilution. *Sigma Chi,* 2000 WL 34414961 at *10–*11, 2000 U.S. Dist. LEXIS 6332 at *33–*34. Therefore, Paddle Tramps's reliance upon *Sigma Chi* to argue the weakness of Greek letter combinations is misplaced and unpersuasive.

In asserting that the marks themselves should be seen as weak, Paddle Tramps

raises the Greek Organizations' lack of effort to police their marks. Paddle Tramps notes one example in which the Fifth Circuit cited a fraternal organization's historical lack of control over its marks in determining that there was no likelihood of confusion as to the source of the mark. *Supreme Assembly, Order of Rainbow for Girls v. J.H. Ray Jewelry Co.,* 676 F.2d 1079, 1083 (5th Cir.1982). In *Rainbow for Girls,* a jeweler sold pieces of jewelry containing the mark of a fraternal organization without a license to do so for twenty-five years. *Id.* at 1081. The Fifth Circuit upheld the district court's determination that there was no likelihood of confusion due to the organization's advertising of another jeweler being its "official sponsor" and the fact that the organization had historically failed to take any actions to control the use of its mark. *Id.* at 1083. Paddle Tramps appears to make a similar argument, asserting that because the Greek Organizations have failed to police their marks for so long, the strength of the marks has declined to such an extent that there is no likelihood of confusion as to the source of the marks.

In determining how to weigh the factor of the strength of the marks, the Court does not give determinative weight to the Greek Organizations' delay. *See Dallas Cowboys,* 616 F.Supp.2d at 634 (noting that the issues of delay were relevant to the defense of laches, but not to the strength of the marks). While the Greek Organizations did generally fail to pursue licensing agreements with manufacturers and distributors for the first three decades of Paddle Tramps's existence, there is no longer a history of a lack of control of the marks that would act to weaken them to such an extent that customers would not make a connection between the products and the owners of the marks. In another case involving the use of the marks of fraternities and sororities, one court rejected a manufacturer's attempt to rely

upon *Rainbow for Girls* to defeat the fraternal organizations' entitlement to trademark protection because of the increased vigilance of these organizations' policing efforts:

> More than twenty years have passed since the Texas district court found a 'historical lack of control' on the part of fraternal organizations with regard to the use of their emblems. To the extent that factor plays any role in the analysis, we think there is evidence here by attempts of the many plaintiffs, as well as other fraternal organizations, to gain control over the use of their marks.

*Alpha Tau Omega Fraternity, Inc. v. Pure Country, Inc.,* No. IP 01–1054–C–B/F, 2004 WL 3391781, at *8 (S.D.Ind. Oct. 26, 2004).

The Court agrees with the *Pure Country* court's decision, which involved evidence regarding several of the Greek Organizations before the Court in this case. Beginning in the 1990s and accelerating in the 2000s, the Greek Organizations have undertaken a strong effort to ensure that the use of their names, insignia, and symbols are done by licensed vendors. Although it is true that there was a lack of control fifteen or twenty years ago, even Paddle Tramps admits that the majority of products featuring the Greek Organizations' marks are now licensed. There is significant evidence in the record that various Greek Organizations (and eventually all of those before the Court collectively) attempted to invite Paddle Tramps to become licensed and eventually to halt them from using their marks. As in *Pure Country,* the Court is convinced that the Greek Organizations' prior lack of control over their marks does not deprive them of protection under the Lanham Act. However, as frequently mentioned elsewhere in this Order, this argument has greater significance in regard to Paddle Tramps's de-

fenses of laches and acquiescence, which shall be addressed in a separate order.

Therefore, the Court concludes that the Greek Organizations possess strong marks in their respective names and combinations of Greek letters, weighing heavily in favor of likelihood of confusion

### 2. The Similarity of the Marks

 The second factor, the similarity of the marks, requires consideration of the marks' appearance, sound, and meaning. *Smack Apparel,* 550 F.3d at 479. Here, it is undisputed that Paddle Tramps is producing and selling products using the names and insignia of the individual Greek Organizations. In fact, the similarity of the marks used in this case is even stronger than that seen in *Smack Apparel.* In that case, the Fifth Circuit noted the "striking similarity" of the alleged infringer's designs in comparing them to the universities' licensed products. *Id.* at 479–80. Notably, the opinion stated, "Although the shirt does not use the initials 'LSU' anywhere, its identification of LSU as the national champion is unmistakable from the colors and the references to the games in which LSU played." *Id.* at 480. Here, Paddle Tramps is actually using the names and insignia of the owners of the marks, going beyond the use of color schemes, phrases, and events associated with mark owners in *Smack Apparel.* Therefore, this direct association using the actual names and insignia of the Greek Organizations denotes an even stronger connection than that which existed in *Smack Apparel,* Therefore, the Court concludes that the appearance, sound, and meaning of the names and insignia are exactly the same or extremely similar to the Greek Organizations' word marks, and that this factor weighs heavily in favor of likelihood of confusion. *See Dallas Cowboys,* 616 F.Supp.2d at 638 (finding a strong likelihood of confusion when an alleged infringer used the exact same words consisting of the trademark owner's mark).

The Court also must evaluate the similarity of the symbols and crests produced by Paddle Tramps to properly licensed products of the Greek Organizations. As discussed previously, the Court has compared the Greek Organizations' crests and symbols and the products produced by Paddle Tramps, and finds that wooden figures produced by Paddle Tramps closely replicate the trademarks of the Greek Organizations.

It is true that Kenneth and Kyle Abraham both testified to the effect that the wooden pieces produced by Paddle Tramps are, in their opinion, not replicas of the marks of the Greek Organizations. However, a close investigation of the wooden figures to the marks of the Greek Organizations conclusively shows that Paddle Tramps's wooden figures clearly are copies of the Greek Organizations' various marks. In fact, elsewhere in their briefing, Paddle Tramps provides arguments regarding its defenses that contradict its contentions that their products do not copy the Greek Organizations' marks. For example, Paddle Tramps's Reply brief regarding its own Motion for Summary Judgment contains an entire section entitled, "From Its Founding, Paddle Tramps Has Been Making and Advertising Its Products Using the Greek Organizations' Marks." Pl.'s Reply Br., Docket No. 70, at 3. The Reply Brief also acknowledges Paddle Tramps's "Consistent Use of Names, Letter Combinations, and Crests" of the Greek Organizations. *Id.* at 5. Paddle Tramps seems to want to have it both ways; while they argue that the marks are generic and not replicas of the Greek Organizations' various marks, they also argue that they have been using those exact same marks for decades to support their defenses of laches and acquiescence. As mentioned above,

that latter fact may be convincing when it comes to their defenses of laches and acquiescence; however, for the purposes of this Motion for Summary Judgment, the Court agrees with Paddle Tramps's own assertion, and finds that it produces products containing marks that are extremely similar to or exactly the same as the Greek Organizations' marks.

In sum, the Court is of the opinion that, as the district court in *Smack Apparel* found, the marks in this case are "virtually identical," "leaving no doubt that [the products] refer" to the fraternities and sororities. *Board of Supervisors of La. State Univ. v. Smack Apparel Co.*, 438 F.Supp.2d 653, 660 (E.D.La.2006). Accordingly, this factor weighs heavily in favor of likelihood of confusion

### 3. The Similarity of the Products or Services

The third factor involves a comparison of the accused infringer's products with those of the properly licensed entity's products. "The greater the similarity between products and services, the greater the likelihood of confusion." *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 505 (5th Cir.1980). In discussing this factor, the Fifth Circuit explained that likelihood of confusion as to similarity of products exists

> when the sponsor or maker of one business or product might naturally be assumed to be the maker or sponsor of another business or product. The confusion evident in such cases is confusion of the business; the deceived customer buys the infringer's product in the belief that it originates with the trademark owner or that it in some way is affiliated with the owner. When this occurs, the infringer is unjustly trading on the true owner's established reputation.

*World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 488 (5th Cir.1971) (quoted in *Elvis Presley*, 141 F.3d at 202). This description was noted in reference to eases where the products were not in direct competition; in this case, the products are in direct competition with one another, often sold at the same venues and aimed at the same customers. The Court must determine whether customers are confused as to the "sponsorship, affiliation, or connection between the parties' products." *Elvis Presley*, 141 F.3d at 202.

In this case, Paddle Tramps is manufacturing and selling products with the exact same names, insignia, or symbols of the Greek Organizations, which are sold directly alongside products that are properly licensed by the Greek Organizations. The identical nature of the products, and the fact that Paddle Tramps's products are in direct competition with the Greek Organizations' licensed products, leads the Court to conclude that this factor weighs heavily in favor of likelihood of confusion. *See Smack Apparel*, 550 F.3d at 481.

### 4. The Identity of the Retail Outlets and Purchasers

The identity of retail outlets in this case consist of college bookstores, craft shops in college towns, and members of the Greek Organizations who make online or direct purchases. The retail outlets to whom Paddle Tramps wholesales its products are in college towns containing communities of fraternities and sororities. While some of these stores are more general outlets tailoring to a college community, such as college book stores or stores containing merchandise affiliated with the college, others cater nearly entirely to fraternity and sorority members. In any case, Paddle Tramps sells its products to stores who also sell similar products licensed by the Greek Organizations, which weighs in favor of likelihood of confusion. *See Smack Apparel*, 550 F.3d at 481 (holding that the fourth digit of confusion

weighs in favor of likelihood of confusion "because the Universities' licensed products are often sold wholesale to the same retailers who purchase Smack's products"). The fact that these products are sold alongside licensed merchandise in stores that specifically tailor to those who would recognize the source of the marks strongly indicates to the Court that the purchasers would assume that the use of the Greek Organizations' marks stemmed from the Greek Organizations themselves, and would therefore be confused as to the source of the merchandise. Paddle Tramps makes no arguments as to the individual members of the Greek Organizations, who admittedly are the target market for their products. Accordingly, this factor weighs in favor of likelihood of confusion.

### 5. The Identity of the Advertising Media Used

Paddle Tramps argues that the Greek Organizations have presented no summary judgment evidence on this topic, and therefore the Court should not weigh this factor. The Court disagrees with this assessment. The Greek Organizations have provided several sources of advertising media that Paddle Tramps uses to promote its products, including at the venues where the products are sold and through the use of internet keywords.

Regarding the physical advertising, the Court agrees with Paddle Tramps that the Greek Organizations have not provided significant evidence of their advertising venues. Therefore, regarding this form of advertising, the Court does not weigh this factor in favor of either party.

One of the major disputes in this case is the use of internet keywords purchased by Paddle Tramps to ensure that searches made on internet search direct to a page where their unlicensed products are offered for sale. The Greek Organizations argue that such behavior is further infringement of the trademarks in their names. Paddle Tramps contends that the purchase of internet search words is permissible in these circumstances, and does not constitute infringing behavior.

In support of their argument that regarding the use of the internet search terms, Paddle Tramps directs the Court to Judge Fish's decision in *Mary Kay, Inc. v. Weber*, 661 F.Supp.2d 632 (N.D.Tex.2009). In *Mary Kay*, Judge Fish determined that a proposed term of an injunction against a defendant whom a jury found to be an infringer regarding the purchase of search term key words was too broad, and declined to adopt it. Judge Fish wrote,

> Under federal trademark law, it is lawful to use another's trademark, but only to the extent it is necessary to identify a product as having been manufactured by the mark owner. *Smack Apparel*, 550 F.3d at 489. Thus, it is clear that the court must require the defendants to use only so much of the Mary Kay mark as is necessary to identify the products they are selling. This holding does not mean, however, that the words "Mary Kay" may only appear directly before the name of a specific Mary Kay product. *Nor does it mean that the defendants may not purchase the words "Mary Kay" as a search term from search engines such as Google or Yahoo.* As the court discussed at length in its memorandum opinion and order on the defendants' motion for summary judgment, the court finds search engines to be a valuable guide to internet users. The court stated that "the law will destroy the valuable resource that search engines have become if it prevents those search engines from doing what they are designed to do: present users with the information they seek as well as related information the user may also find helpful or interesting." . . .

The court's holding does mean, however, that any use of the Mary Kay mark must exist for the sole purpose of informing customers that the defendants, as an entity entirely separate and distinct from Mary Kay, offer Mary Kay products for sale. Any use that implies affiliation with, sponsorship by, or endorsement by Mary Kay is unlawful. *Smack Apparel,* 550 F.3d at 489. Unfortunately, it is difficult to be more specific, as every use of a mark is different. The court notes, however, that the defendants should use caution every time they use the Mary Kay mark-even if that use directly precedes the name of a specific Mary Kay product. Any use of the words "Mary Kay," without an explanation that the defendants are not Mary Kay and have no affiliation with Mary Kay, is suspect.

*Mary Kay,* 661 F.Supp.2d at 646 (emphasis added).

In this case, it appears that there is a use of search engine key words that may be "suspect" in the same way that Judge Fish identified in *Mary Kay,* such as "Sigma Chi paddle." However, while the unlicensed use of such keywords to sell unlicensed products does influence the Court's decision on whether a likelihood of confusion exists, the Court shall not address the question of whether the use of the Greek Organizations' word marks by purchasing internet key words is impermissible at this stage. As mentioned elsewhere in this Order, the Court shall not determine the issue of whether the Greek Organizations are entitled to injunctive relief, or the scope of that relief, until the Court has issued a decision on Paddle Tramps's Motion for Summary Judgment regarding its defenses. Therefore, the Court shall accept Paddle Tramps's argument regarding this factor and does not weigh it in favor of either party. However, the Court does note Judge Fish's conclusion that "[a]ny use that implies affiliation with, sponsor-ship by, or endorsement by" the Greek Organizations "is unlawful" if there is no actual affiliation, sponsorship or endorsement by the Greek Organizations. *Id.* at 646.

### 6. The Defendant's Intent

The sixth digit of confusion is the alleged infringer's intent to confuse the public. *Elvis Presley,* 141 F.3d at 203. The Greek Organizations argue that the circumstances of this case are similar to those seen in *Smack Apparel,* in which the trademark owner presented admissions by the alleged infringer, a manufacturer of tee shirts, that it "used school colors and 'other indicia' with the intent of identifying the university plaintiffs as the subject of the message expressed in the shirt design." *Smack Apparel,* 550 F.3d at 481. The Fifth Circuit explained:

> Smack asserts that its intent to copy is not the same as an intent to confuse. The circumstances of this case show, however, that Smack intended to capitalize on the potential for confusion. Smack knew that its shirts were sold in the same venues as and sometimes alongside officially licensed merchandise, and it intentionally incorporated color marks to create the kind of association with the Universities that would influence purchasers.

*Id.* at 482.

As in *Smack Apparel,* the alleged infringer in this case admits to using designs associated with the Greek Organizations by their members "to create the kind of association with the [sororities and fraternities] that would influence purchasers." *Id.* This element also appears to be met in this case in view of the Fifth Circuit's opinion in *Boston Hockey,* which read in relevant part,

> The confusion or deceit requirement is met by the fact that the defendant duplicated the protected trademarks and sold them to the public *knowing that the*

*public would identify them as being the teams' trademarks.* The certain knowledge of the buyer that the source and origin of the trademark symbols were in plaintiffs satisfies the requirement of the act. The argument that confusion must be as to the source of the manufacture of the emblem itself is unpersuasive, *where the trademark, originated by the team, is the triggering mechanism for the sale of the emblem.*

*Boston Hockey,* 510 F.2d at 1012 (emphasis added).

Based upon the statements of Paddle Tramps's owners and executives, this assessment would also apply to Paddle Tramps's use of the Greek Organizations' marks. Paddle Tramps's use of the names of Greek Organizations to sell their "paddle kits" indicates that Paddle Tramps knew that the public, and their targeted customers (i.e. fraternity and sorority members and their families), would identify their products as being affiliated with the teams' trademarks. Furthermore, it is quite clear that the trademarked Greek letter combinations, crests, or symbols is "the triggering mechanism for the sale" of Paddle Tramps's products. *Id.*

Paddle Tramps argues that the purpose of its business is to create a quality, superior product, and that this intent is different than that which was seen in cases such as *Smack Apparel.* Such reasoning appears to reference one Fifth Circuit panel's expression that "[i]ntent to compete . . . is not tantamount to intent to confuse." *Scott Fetzer Co. v. House of Vacuums Inc.,* 381 F.3d 477, 486 (5th Cir.2004). Further attempting to justify its behavior, Paddle Tramps argues that this case is distinguishable from *Smack Apparel* because the defendant in that case "admitted adopting the mark to make money," while Paddle Tramps's intent was focused on ease for members of the Greek Organizations and the construction of a quality

product. Pl.'s Resp. Br., Docket No. 66, at 32.

The Court rejects this argument. The Fifth Circuit's decision in *Smack Apparel* clearly indicates that when one's use of a mark is intended to bring the owner of the mark to mind, and where the alleged infringer utilizes such association to encourage sales of its products, such behavior is impermissible trademark infringement. Paddle Tramps misinterprets the meaning of "intent" in this context. Instead, the Court's inquiry is into whether the alleged infringer intended "to create the kind of association with the [sororities and fraternities] that would influence purchasers." *Smack Apparel,* 550 F.3d at 482. It is quite clear to the Court that Mr. Abraham started Paddle Tramps knowing that the purchasers of his products would be members of Greek Organizations, and that the triggering mechanism of the purchase of the product rose out of their desire to be affiliated and identified with their Greek Organization. *See Boston Hockey,* 510 F.2d at 1012. For the inquiry related to this specific factor for likelihood of confusion, such knowledge clearly demonstrates that Paddle Tramps at least possessed the knowledge that the sale of its products was triggered by the unlicensed use of marks associated with the Greek Organizations. Trying to distinguish this case from *Smack Apparel* by arguing that Paddle Tramps's use was not motivated by profit is unavailing when Paddle Tramps clearly produced products aimed at members of the Greek Organizations that it knows contains marks and symbols that prompt the purchase of those objects.

It is true that certain courts have held that there can be other "plausible" explanations for an intent to copy one's mark or dress, such as attempting to provide replacement parts in a superior way than the manufacturer of the product. *See, e.g., Sno–Wizard Mfg., Inc. v. Eisemann*

*Prods. Co.*, 791 F.2d 423 (5th Cir.1986). Such motivations can show that there was an intent other trying to "pass off" one's products as another's. Paddle Tramps attempts to utilize this line of argument, arguing that its intent was to make the paddle decoration process easier for members of Greek Organizations, or to create products of a superior quality. However, the Court is convinced that, in this case, there was an intent to "create the kind of association with the [sororities and fraternities] that would influence purchasers" in manufacturing and selling products directly to that market, thus deriving a benefit from their names and marks. *Smack Apparel*, 550 F.3d at 482. Therefore, the Court is of the opinion that the Greek Organizations have successfully demonstrated that this factor weighs in favor of likelihood of confusion.

Going beyond the intent inquiry for likelihood of confusion purposes, however, much of the argument between the parties as to Paddle Tramps's intent was made in regard to the Greek Organizations' contention that Paddle Tramps could not assert the defense of laches due to the fact that their infringement was intentional. The Fifth Circuit has indicated that the inquiry into the intent necessary to bar the assertion of an equitable defense such as laches may be different that the intent inquiry regarding likelihood of confusion. *See Conan Props., Inc. v. Conans Pizza*, 752 F.2d 145, 150 (5th Cir.1985) (noting that a party attempting to deny a party the use of the equitable defense of laches must show that the infringing party possessed "an explicit bad faith intent of 'passing off' its service and product as emanating from or en-

dorsed by" the mark owner); *see also Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1159 n. 7 (5th Cir.1982). Whether Paddle Tramps acted with the intent necessary to bar its assertion of the laches defense is a question that the Court has yet to decide. Accordingly, the Court shall not issue a decision upon the issue of Paddle Tramps's intent in regard to whether it does not have the clean hands necessary to assert equitable defenses until the Court issues a decision on Paddle Tramps's Motion for Summary Judgment.

In sum, while this factor weighs in favor of a likelihood of confusion, certain issues surrounding Paddle Tramps's intent are yet to be resolved.[14] Therefore, while the intent factor in this context weighs in favor of a likelihood of confusion, the Court shall revisit the issue of Paddle Tramps's intent for the purpose of ruling upon Paddle Tramps's Motion for Summary Judgment at the appropriate time.

### 7. Any Evidence of Actual Confusion

The seventh factor that the Court must consider its customers' evidence of actual confusion in purchasing the products at issue. The Greek Organizations have provided a number of sworn statements of members of Greek Organizations expressing that they were confused by Paddle Tramps's products and mistook them as originating from their respective Greek Organizations. Paddle Tramps objects to the use of this evidence, due to the untimeliness of their disclosure and Paddle Tramps's inability to cross-examine those who made the statements. Paddle Tramps further argues that it would be unable to undertake this effort because of a shortage of available time.[15] Paddle Tramps also

---

**14.** In any case, "[n]o single factor is dispositive," *Smack Apparel*, 550 F.3d at 478, and Paddle Tramps's intent to confuse is "not necessary to finding a likelihood of confusion." *Id.* at 481. Taking all of the factors into account, even if the Court does not con-

sider the intent factor, the Court is of the opinion that the other digits of confusion by themselves sufficiently demonstrate that there was a likelihood of confusion in this case.

**15.** The Court notes that the parties jointly moved for a delay of the trial date until the

notes that evidence of actual confusion is very important to the Court's determination of the issue of likelihood of confusion, and asks the Court not to consider this evidence.

While evidence of actual confusion is certainly relevant to the Court's decision, the Court does not wish to prejudice Paddle Tramps in its determination if it believes the evidence of actual confusion could be discounted by cross-examination or countering of the statements at issue. Although the Court does believe that these statements can appropriately be considered at this stage, the Court will grant Paddle Tramps's request and not consider the declarations.

■ However, declining to consider this evidence is not determinative upon the Court's ultimate conclusion regarding whether there was a likelihood of confusion in this case. Notably, "[n]o single factor is dispositive." *Smack Apparel*, 550 F.3d at 478. Furthermore, "[i]t is well established . . . that evidence of actual confusion is not necessary for a finding of a likelihood of confusion." *Id.* at 483. Because of the strength of the other factors in favor of a likelihood of confusion, the Court need not consider the evidence at issue to make its determination. Therefore, the Court shall not weigh this factor in favor of either party.

### 8. Degree of Care Exercised by Potential Purchasers

The Court next considers the degree of care of those who would purchase the products at issue.[16] There are two groups of potential purchasers in this case; retail shops and members of Greek Organizations. Paddle Tramps is correct that the retail shops are likely to be sophisticated purchasers; they have contractual relationships with Paddle Tramps, and, as the Greek Organizations themselves note, many of these retailers sell Paddle Tramps's products alongside licensed products. The Greek Organizations do not convincingly counter this point; accordingly, the Court accepts Paddle Tramps's contention that "the retailers may be assumed to be sophisticated buyers." *Merriam–Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 72 (2d Cir.1994). Accordingly, regarding the retailers, this factor weighs against likelihood of confusion.

The second set of potential purchasers are the members of the Greek Organizations. As the Court has made clear at various parts of its analysis, Paddle Tramps's products and products properly licensed by the Greek Organizations are also aimed at the same customer base: members of the Greek Organizations, and, at times, friends and family members of those individuals. The Court is of the opinion that purchases of the items at issue are made by members of Greek Organizations who are distinctly aware of what they are buying and for what purpose: creation of a ceremonial paddle. The items at issue are not "impulse buys" or inexpensive (as a whole); therefore, these characteristics would not prompt a potential purchases to exercise a lesser degree of care. *Smack Apparel*, 550 F.3d at 483; *Sun–Fun–Prods., Inc. v. Suntan Research & Dev. Inc.*, 656 F.2d 186, 191 (5th Cir.1981).

Court's decision on the pending Motions for Summary Judgment (Docket No. 73), which the Court granted, but Paddle Tramps has not to this point supplemented its briefing indicating that it has attempted to interview or obtained statements from the relevant declarants.

16. The factor of the degree of care exercised by potential purchases has also been described as "the sophistication of the relevant consumer group." GARY MYERS, PRINCIPLES OF INTELLECTUAL PROPERTY LAW 209 (2008).

However, other factors counsel against fully weighing this factor against a likelihood of confusion as to the members of the Greek Organizations. The products themselves are nearly identical; even with a careful examination and a heavy degree of care, it would be difficult to tell the difference between Paddle Tramps's product and those that are properly licensed. The fact that the unlicensed products also show up as results in internet searches that utilize the Greek Organizations' protected trademarks further adds to the difficulty in differentiating between licensed products authorized by the Greek Organizations and unlicensed products produced by Paddle Tramps regardless of the degree of care. Furthermore, members of Greek Organizations would be unable to tell by the images of Paddle Tramps's products on its website that its products are unlicensed because the images show only portions of the products and likely not where the symbol identifying a product as properly licensed by a Greek Organization would be.

Paddle Tramps argues that the fault lies with the Greek Organizations because their members are not properly instructed to only purchase from licensed vendors or look for licensed products, and that members of the Greek Organizations want to buy Paddle Tramps's products regardless of who manufactures them or whether they are licensed. In support of this contention, Paddle Tramps points to various informational items that the Greek Organizations put out to their members informing them to look for specific symbols that indicate that the products are properly licensed.

The Court is not convinced by this argument. As the Fifth Circuit stated in *Smack Apparel*:

We are not persuaded that simply because some consumers might not care whether Smack's shirts are officially licensed the likelihood of confusion is negated. Whether or not a consumer *cares* about official sponsorship is a different question from whether that consumer would likely *believe* the product is officially sponsored.

*Smack Apparel,* 550 F.3d at 485 (emphasis in original). This reasoning applies equally to this case. In many cases, the Court is convinced that, although some members of Greek Organizations may be aware of the difference between licensed and unlicensed products, many members would still be unaware of the difference (particularly those who could not check if the products were licensed through the online images), and would likely believe the product is officially sponsored. Accordingly, while the educational efforts of Greek Organizations does increase the sophistication of potential purchases to some degree, that impact on the significance of the degree of care used may not be particularly extensive, especially considering the online sales methods of Paddle Tramps.

Ultimately, the arguments of the parties are quite balanced regarding this factor. It is true that because the products are identical, it is likely that members of the Greek Organizations would likely be unable to differentiate between licensed and unlicensed products even if they used a high degree of care. At the same time, the members of the Greek Organizations are sophisticated to at least some degree because of the importance of the traditions they are following to the Greek Organizations and that some of them may be aware of the presence of unlicensed products and have received instructions as to how to differentiate between them. Regarding the members of the Greek Organizations, then, the Court does not weigh this factor in favor of either party.

\* \* \*

After considering and weighing all of the factors, and determining that a majority of

the factors weigh in favor of a likelihood of confusion, the Court agrees with the Greek Organizations that in this case, "confusion is self-evident." *Boston Hockey,* 510 F.2d at 1012. In support of its conclusion, the Court notes the prescient decision of the district court in *Sigma Chi,* which, dealing with marks similar to the marks addressed in this case and relying upon the reasoning of *Boston Hockey,* held,

> [T]he conclusion is inescapable that, without Sigma Chi's marks (or those of other fraternities and sororities), [the alleged infringer] would not have a market for its particular products among fraternity and sorority members desiring to purchase products bearing the marks of their respective fraternity or sorority.... In this regard, the confusion factor is met where, as here, the registered mark, originated by Sigma Chi, is the triggering mechanism for the sale of the product.

*Sigma Chi,* 2000 WL 34414961 at *9, 2000 U.S. Dist. LEXIS 6332 at *29 (citing *Boston Hockey,* 510 F.2d at 1011–12). This passage effectively reflects the ultimate reasoning of the Court's determination that the Greek Organizations have successfully established that Paddle Tramps infringed upon their marks.

Accordingly, it is the opinion of the Court that the Greek Organizations have successfully shown that their marks were infringed by Paddle Tramps and that there is no genuine issue of fact regarding this issue.[17]

## V. Trademark Dilution

The Greek Organizations also raise claims against Paddle Tramps for trademark dilution under Texas state law. "Trademark dilution is the weakening of the ability of a mark to clearly and unmis-takably distinguish the source of a product." *Scott Fetzer Co.,* 381 F.3d at 489; *see also Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Imp. Corp.,* 53 S.W.3d 799, 812 (Tex.App.-Austin 2001, pet. denied.). The Texas anti-dilution statute provides:

> A person may bring an action to enjoin an act likely to injure a business reputation or to dilute the distinctive quality of a mark registered under this chapter or Title 15, U.S.C., or a mark or trade name valid at common law, regardless of whether there is competition between the parties or confusion as to the source of goods or services.

Tex. Bus. & Com.Code § 16.29. Under this statute, a claimant must show "(1) ownership of a distinctive mark and (2) a likelihood of dilution." *Pebble Beach Co. v. Tour 18 I, Ltd.,* 942 F.Supp. 1513, 1564 (S.D.Tex.1996) (Hittner, J.). "The owner of a distinctive mark may obtain relief under an anti-dilution statute if there is a 'likelihood of dilution' due to (1) 'blurring,' a diminution in the uniqueness and individuality of the mark, or (2) 'tarnishment,' an injury resulting from another's use of the mark in a manner that tarnishes or appropriates the goodwill and reputation associated with the plaintiff's mark." *Exxon Corp.,* 109 F.3d at 1081 (footnotes and citations omitted).

Paddle Tramps argues that the Greek Organizations should not be able to raise dilution claims in this case because such claims are usually reserved for non-competing goods, and that infringement is the proper remedy for competing goods. In support of this argument, Paddle Tramps refers the Court to the Fifth Circuit's opinion in *Holiday Inns, Inc. v. Holiday Out in America,* 481 F.2d 445 (5th Cir. 1973), which reads in relevant part,

---

17. Because the Court has determined that Paddle Tramps did infringe upon the Greek Organizations' marks, the Court need not reach the Greek Organizations' argument that Paddle Tramps infringed through progressive encroachment.

Dilution is a concept most applicable where a subsequent user uses the trademark of a prior user for a product so dissimilar from the product of the prior user that there is no likelihood of confusion of the products or sources, but where the use of the trademark by the subsequent user will lessen the uniqueness of the prior user's mark with the possible future result that a strong mark may become a weak mark.

*Id.* at 450. "Dilution legislation flowed from a desire to prevent 'hypothetical anomalies' such as 'Dupont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, Bulova gowns, and so forth.'" *E. & J. Gallo Winery v. Spider Webs Ltd.,* 129 F.Supp.2d 1033, 1037 (S.D.Tex.2001) (Crone, J.) (quoting *Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 875 F.2d 1026, 1031 (2d Cir.1989)). Paddle Tramps thus argues that this claim is not appropriate under these circumstances of direct competition.

 In this case, it is true that the marks properly licensed by the Greek Organizations and those being used by Paddle Tramps are identical or nearly identical, and are used within exactly the same field. Accordingly, the use of a dilution claim does not fit within the traditional purposes of anti-dilution statutes as articulated in *Holiday Inns* and *E. & J. Gallo.* However, upon looking at the Texas anti-dilution statute under which these claims were brought, the Court cannot accept Paddle Tramps's argument that such a claim should not be raised in this case. The Texas anti-dilution statute provides that a claim for dilution may be brought "*regardless* of whether there is competition between the parties." Tex. Bus. & Com.

Code § 16.29 (emphasis added). Accordingly, "the Texas anti-dilution statute applies to competitive goods and services." *Pebble Beach,* 942 F.Supp. at 1564.

 To determine whether a mark is distinctive under the Texas anti-dilution statute, the Court considers "whether the mark is arbitrary, the length of time the user has employed the mark, the scope of the user's advertising and promotions, the nature and extent of the first user's business, and the scope of the first user's reputation." *Advantage Rent–A–Car, Inc. v. Enterprise Rent–A–Car, Co.,* 238 F.3d 378, 381 (5th Cir.2001). As the above analysis for trademark infringement and unfair competition has shown, the Greek Organizations have demonstrated ownership of distinctive marks consisting of combinations of Greek letters, their insignia, their crests, and their symbols. These marks possess "arbitrary" classifications, or at least are deserving of an inherently distinctive classification. Additionally, the parties have provided to the Court substantial information about each side's uses of the marks. The Greek Organizations have used their marks from time periods ranging from decades to a few years. Regarding the marks used by Paddle Tramps, however, the Court is convinced that they are distinctive for the purpose of the dilution inquiry. While it is true that, the Fifth Circuit acknowledged that "a somewhat stricter standard is to be applied in determining 'strength' in dilution analysis than in likelihood of confusion analysis," *id.* (quoting *Pebble Beach,* 942 F.Supp. at 1565), the Court is of the opinion that this standard has been met in this case, and that their marks are sufficiently strong enough to be diluted.[18]

**18.** Paddle Tramps notes that previous decisions dealing with the insignia of fraternities and sororities have declined to find dilution. *See Sigma Chi,* 2000 WL 34414961 at *10, 2000 U.S. Dist. LEXIS 6332 at *33; *Pure*

*Country,* 2004 WL 3391781 at *12–*14. Notably, however, both of those decisions were issued under federal trademark dilution laws, which require the marks asserted to be a

■ The Court's analysis now shifts to the second step of determining whether there was a likelihood of dilution. Here, the Court assesses whether the Greek Organizations have demonstrated that Paddle Tramps's actions have "tarnished" or "blurred" their marks. *Exxon Corp.*, 109 F.3d at 1081. The Greek Organizations claim that the "blurring" form of dilution is the only form of dilution present in this case. Defs.' Reply Br., Docket No. 72, at 19. Therefore, the Court shall not address whether "tarnishment" took place and shall focus its inquiry upon "blurring."

Interpreting the Texas anti-dilution statute, both federal and state courts have determined that, if the claimant holds a distinctive mark, "it is enough [for dilution] that the defendant has made significant use of a very similar mark." *Pebble Beach*, 942 F.Supp. at 1564 (quoting *Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1186 (11th Cir.1985)); *Horseshoe Bay*, 53 S.W.3d at 812. In this case, Paddle Tramps admits that it has been producing products containing the Greek Organizations' marks for decades; indeed, the marks used by Paddle Tramps are not just "very similar"; they are identical or nearly identical. Such evidence strongly supports a finding of dilution. As the Supreme Court provided, "It may well be . . . that direct evidence of dilution such as consumer surveys will not be necessary if actual dilution can be reliably proved through circumstantial evidence—*the obvi-*

*ous case is one where the junior and senior marks are identical." Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 434, 123 S.Ct. 1115, 155 L.Ed.2d 1 (2003) (emphasis added).

In this case, the junior marks of Paddle Tramps are identical to the senior marks of the Greek Organizations; such a finding is sufficient to demonstrate dilution under Texas law. As Judge Cummings wrote in a case regarding the sale of unlicensed products bearing a university's logo,

> Spiegelberg's use of the marks is almost certain to cause dilution by blurring. The circulation of unlicensed products bearing Texas Tech's marks will likely blur the uniqueness of officially licensed products. Undoubtedly, the sale of unlicensed products will result in diminished individuality of the officially licensed products.

*Texas Tech*, 461 F.Supp.2d at 523–24. Such reasoning applies equally to the circumstances of this case. Accordingly, the Court is of the opinion that Paddle Tramps has committed trademark dilution under Texas law, and that there is no genuine issue of material fact as to this claim.

## VI. Paddle Tramp s's Defenses

Paddle Tramps raised the defenses of laches and acquiescence in its own Motion for Summary Judgment (Docket No. 48). As previously provided in this Order, the Court has not yet determined whether

---

"famous mark that is distinctive." 15 U.S.C. § 1125(c); *Advantage Rent–A–Car, Inc. v. Enterprise Rent–A–Car, Co.*, 238 F.3d 378, 381 (5th Cir.2001). The Texas anti-dilution statute, however, contains no such "fame" requirement; a mark need only be "distinctive." *Advantage Rent–A–Car*, 238 F.3d at 381. For example, the *Sigma Chi* court, in specifically addressing the "famous" part of the inquiry, noted, "Even if a mark is distinctive in its particular market, it does not render it inherently distinctive so as to engender immediate recognition in the general public

of a particular product." *Sigma Chi*, 2000 WL 34414961 at *10, 2000 U.S. Dist. LEXIS 6332 at *33 (quoting *Michael Caruso & Co. v. Estefan Enters.*, 994 F.Supp. 1454, 1463 (S.D.Fla.1998)). Because the Greek Organizations' dilution claim is brought under Texas law, however, the Court need not assess its recognition in the general public because this goes to the "fame" of the mark. Within the field in which these products are sold, the mark is distinctive; therefore, this first element has been met.

laches or acquiescence act to bar some or all of the Greek Organizations' claims. Accordingly, the Court shall, by separate order, schedule a hearing regarding Paddle Tramps's Motion for Summary Judgment, and shall issue its decision regarding that Motion at a later date.

## VII. The Greek Organizations' Requested Remedy

As mentioned above, the Greek Organizations have not asked the Court to determine the issue of damages at this time. The Greek Organizations have, however, asked the Court to issue an injunction preventing Paddle Tramps from continuing in its infringing behavior.

While the Court has determined that Paddle Tramps has infringed upon the Greek Organizations' marks, the Court has yet to determine whether, regardless of this behavior, the Greek Organizations' claims are barred by Paddle Tramps's defenses of laches or acquiescence. Accordingly, the Court shall not rule upon the issue of whether an preliminary injunction in this case is appropriate, or what the scope of that preliminary injunction should be, until after the Court issues a decision on Paddle Tramps's Motion for Summary Judgment.

## Conclusion

For the reasons stated above, it is the opinion of the Court that Paddle Tramps has infringed upon the Greek Organization's trademarks. There is no genuine issue of material fact that the Greek Organizations possessed legally protectable marks, that Paddle Tramps used the Greek Organizations names, insignia, and symbols, and such use created a likelihood of confusion among the public. Therefore, the Greek Organizations' Motion for Summary Judgment as to liability for trademark infringement and unfair competition is GRANTED. Furthermore, Paddle Tramps has also diluted the Greek Organizations' marks through the unlicensed use of identical or nearly identical marks; therefore, the Greek Organizations' Motion for Summary Judgment as to liability for trademark dilution is also GRANTED.

The Court shall not issue a decision regarding whether a preliminary injunction is an appropriate remedy for the infringement until after the Court issues a decision on Paddle Tramps's Motion for Summary Judgment relating to its defenses of laches and acquiescence. Accordingly, as to the issue of whether a preliminary injunction is appropriate, the Greek Organizations' Motion for Summary Judgment is DENIED WITHOUT PREJUDICE. Following the Court's decision on Paddle Tramps's Motion for Summary Judgment, the Greek Organizations will, if necessary, have the opportunity to file an additional motion relating solely to the issue of injunctive relief.

IT IS SO ORDERED.